IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ANNETTE BOHANNON,                )
                                 )
           Plaintiff,            )
                                 )
      v.                         )    CASE NO. 2:09-CV-701-WKW [WO]
                                 )
JOSEPH MORTON, *et al.*,         )
                                 )
           Defendants.           )

## MEMORANDUM OPINION AND ORDER

Plaintiff Annette Bohannon brings this action against Defendants Joseph Morton, Deann Stone, and Sallye Longshore (collectively, "Defendants"), as individuals and in their official capacities with the Alabama Department of Education, under 42 U.S.C. § 1983, alleging violations of her First Amendment right to free speech. This cause is before the court on Defendants' Motion for Summary Judgment (Doc. # 23), which has been fully briefed and is ready for disposition. Upon careful consideration of counsels' briefs, the relevant law, and the record as a whole, the court finds that Defendants' motion is due to be granted.

## I. JURISDICTION AND VENUE

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. §§ 1331 and 1343. The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations in support of both.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*); Fed. R. Civ. P. 56(c).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists.  Fed. R. Civ. P. 56(e)(2); *Celotex Corp.*, 477 U.S. at 324; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  What is material is determined by the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."

*McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (internal quotation marks and citation omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). However, if the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*). Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323.

3

On summary judgment, the facts must be viewed in the light most favorable to the nonmovant.  *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).  Hence, "'facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.'" *Id.* (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000)).

### III.  FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of the Alabama Department of Education's ("DOE") decision not to extend Dr. Bohannon's probationary employment as Director of the 21st Century Community Learning Center ("CCLC") grant program beyond June 30, 2009.  (Doc. # 31, at 3.)  Dr. Bohannon claims that she was terminated as a result of exercising her right to free speech about alleged improprieties in the administration and awarding of CCLC grants by Defendants and other members of the DOE.  The facts, construed in the light most favorable to Dr. Bohannon, follow.

**A.      Dr. Bohannon's Employment with the DOE**

Dr. Bohannon was employed with the DOE as an Education Specialist in the Federal Programs section from June 16, 2008, until June 30, 2009.  (Bohannon Dep. 11, 141.)  Her chain of command at the DOE is pertinent background information to the issues at hand. Defendant Longshore was Dr. Bohannon's direct supervisor, and had been employed with the DOE as an Education Administrator since February 1, 2008.  (Longshore Dep. 13, 23.) Ms. Longshore reported to Defendant Stone, who has served with the DOE since 1999 and

4

been the Director of Federal Programs since June 2007.  (Stone Dep. 10-11; Bice Dep. 11.)

Dr. Stone reported to Mr. Feagin Johnson, who is a DOE Assistant Superintendent and is not

a party to this litigation.  (Bice Dep. 11.)  Mr. Johnson reported to Dr. Bice, who is a DOE

Deputy Superintendent, responsible for supervision of a myriad of DOE activities including

federal programs, which includes the CCLC grants.  (Bice Dep. 10.)  Dr. Bice is also not a

party to this litigation; however, his actions as Deputy Superintendent are material to this

case.  As one of two DOE Deputy Superintendents, Dr. Bice reported directly to Defendant

Morton, the State Superintendent of Education.  (Morton Dep. 8-9; Bice Dep. 11.)

Dr. Bohannon's employment during the initial one-year period was probationary.

(Bohannon Dep. 11.)  On January 5, 2009, in a meeting with Ms. Longshore and Dr. Stone,

Dr. Stone told Dr. Bohannon that she "had until June 30th to find another job."  (Bohannon

Dep. 140-41.)  According to the DOE's Notice of Claim and Request for Separation

Information, "Employee was not granted permanent status at the end of her one-year

probationary period (standard period for the classification of Education Specialist).  She did

not meet standards and also had one 'unsatisfactory' work habit."  (Morton Dep. Ex. 6.)  On

January 21, 2009, Dr. Morton sent Dr. Bohannon a letter stating that she was to be separated

from employment prior to the completion of the probationary period because her work was

"not meeting the standards of the job."  (Bohannon Dep. Ex.17, at 3.)  The letter further

provided, "You received a rating of Partially Meets Standards on your final probationary

report."[1]  (Bohannon Dep. Ex.17, at 3.)  In the letter, Dr. Morton also explained that he had

received "a recommendation from Dr. Deann Stone, Director of Federal Programs, that your

employment as an Educational Specialist with the State [DOE] be terminated . . . ."

(Bohannon Dep. Ex.17, at 3.)

**B.**     **Dr. Bohannon's Alleged Instances of Protected Speech**

Dr. Bohannon's First Amendment claim arises from her speech raising concerns about

the administration of the CCLC grants and Defendants' alleged retaliation for that speech by

not renewing her employment beyond the probationary period.  (Compl. ¶¶ 20-23.)  All facts

surrounding the incidents of speech in question are construed in the light most favorable to

Dr. Bohannon.

*1.      First Instance of Alleged Protected Speech*

On August 14, 2008, Dr. Bohannon was called to a meeting with Ms. Longshore and

Dr. Stone, her supervisors, to discuss the application of Better Basics, Incorporated ("Better

Basics") for a CCLC grant.  (Bohannon Dep. 35-36.)  Ms. Longshore called the meeting by

an e-mail message that morning, stating "[w]e need to make a determination about [the Better

Basics] grant - Board and Supt pressure!  I will meet you in Commons area."  (Stone Dep.

Ex. 10, at 2.)  Dr. Bohannon had concerns about the Better Basics application because it

scored a 69 in the review process conducted by the CCLC grant readers.  (Bohannon Dep.

---

[1] Defendant Morton contends that he did not sign the letter and that Dr. Bohannon was not
terminated, but rather that she was a probationary employee who was not extended permanent status.
(Morton Dep. 90-93.)  Because the parties use the terms interchangeably and the effect of a termination
or decision not to retain is the same at this stage, the court will cite the parties' use of both terms.

27, 29.)  In general, the cutoff score for funding CCLC applications was 90, and DOE funding of applications below that level was an exception.[2]  (Bohannon Dep. 27.)

During the meeting about the Better Basics grant in the common area, Dr. Stone and Ms. Longshore "were questioning and looking at Better Basics' application, [and] they were discussing the particulars of the application." (Bohannon Dep. 35.) Dr. Bohannon explained her thoughts about the meeting: "I didn't know why we were at the table, because we had already looked at [the Better Basics'] score and [it] did not qualify." (Bohannon Dep. 35.) Ms. Longshore, however, said that the Better Basics grant was "going to be funded," and "Dr. [Eddie] Johnson and the state board member, Dr. Ethel Hall, wanted it funded and that they were powerful people."[3]  (Bohannon Dep. 35-36.)  Dr. Bohannon replied "[t]hat it wasn't right. [S]ome other grantee that qualified would be bumped and lose their grant.  It was unethical and unfair." (Bohannon Dep. 36.)  In response, either Dr. Stone or Ms. Longshore told Dr. Bohannon that "it didn't matter what [her] opinion was, that it was [her] job," and Dr. Bohannon was "also reminded that [she] was on probation . . . ." (Bohannon

---

[2] Dr. Bohannon does not point to a written policy concerning this cutoff number, but did produce evidence that Dr. Stone spoke of this number as a cutoff and that it was an exception for a program to receive funding after scoring below this level.  (Bohannon Dep. 30-32.)  According to Judy Manning, an Educational Consultant in the Federal Programs department of the DOE, the state had "never skipped grants before [to fund a grant below 90]," and to fund a score of 69 was "going to cause somebody a lot of problems unless there [was] a valid reason for this." (Manning Dep. 33-35.)

[3] Dr. Eddie Johnson is the DOE's other Deputy Superintendent, not to be confused with Mr. Feagin Johnson, DOE Assistant Superintendent, mentioned *supra*.  Dr. Eddie Johnson is not a party to this litigation.

Dep. 36.)  Finally, Dr. Bohannon asked multiple times "if [she] could be excused from overseeing the process for that particular grant."  (Bohannon Dep. 36.)

In explaining her motivation for asking to be excused from the grant, Dr. Bohannon said:

> my primary concern was that someone was denied their money.  It's public money, and they did not receive it.  And I felt like I took a great risk in speaking out, but I also believe that it was my responsibility to do that.  I'm a taxpayer just like everybody else, and this is taxpayer's dollars.  And nothing was ever said to lead me to believe that this was not a – pressure decision to score a disqualified – I mean, a grantee that didn't qualify based on the scoring criteria.

(Bohannon Dep. 94.)  Dr. Bohannon testified at her deposition that "[she] had professional concerns, but [she] also had personal concerns, which is why [she] spoke out."  (Bohannon Dep. 93.)  In addition, Better Basics' grant application did not comply with the DOE's procedures requiring inclusion of a budget with the application.[4]  (Doc. # 31, at 13.)  Notwithstanding Dr. Bohannon's complaints and her request to be excused from overseeing the Better Basics application, the Better Basics grant was funded by the DOE.  (Bohannon Dep. 41.)

### 2.   *Second Instance of Alleged Protected Speech*

After the August 14, 2008 meeting with Ms. Longshore and Dr. Stone, Dr. Bohannon spoke with Edmund Moore about the Better Basics grant.  (Bohannon Dep. 37.)  Edmund Moore is an Education Administrator in the Federal Programs section of the DOE, on the

---

[4] Whether the Better Basics grant actually complied with DOE funding policy and procedures is not at issue in this motion for summary judgment.

same level as Ms. Longshore, but outside of Dr. Bohannon's chain of command regarding CCLC grants. (Bohannon Dep. 56.) Mr. Moore is not a party to this lawsuit. Following her meeting with Ms. Longshore and Dr. Stone, Dr. Bohannon encountered Mr. Moore in their work area and told him, "I was upset about Better Basics being funded. . . . I told him about my ethical concerns. I told him that I asked to be excused. I asked him could he help me." (Bohannon Dep. 37.) In response, Mr. Moore told Dr. Bohannon "that if Dr. Johnson and Dr. Hall and other state board members were going to tell us who to give the money to, then we shouldn't have competitive grants. . . . And he advised [Dr. Bohannon] that it was probably best for [her] just to not say anything else about it." (Bohannon Dep. 37.) Dr. Bohannon conceded in her deposition, however, that her allegedly protected speech to Mr. Moore did not play a role in the DOE's decision not to retain her beyond her probationary period. (Bohannon Dep. 220-22.)

### 3.    *Third Instance of Alleged Protected Speech*

In either August or September 2008, Dr. Bohannon also spoke to Mr. Moore and Beth Thompson, during a working lunch, about her concerns with the awarding of a CCLC grant to Better Basics. (Bohannon Dep. 38.) Ms. Thompson is an Education Specialist in the Alabama DOE and oversees the Homeless Education competitive grant program. (Thompson Dep. 11.) Ms. Thompson was a co-worker of Dr. Bohannon, but was not in her chain of command, nor is she a party in this lawsuit. (Thompson Dep. 13.) At the working lunch, Dr. Bohannon expressed her concerns about the Better Basics grant and sought "guidance from

9

Edmund [Moore] and ask[ed] Beth [Thompson] her opinion on how [she] should handle it."

(Bohannon Dep. 43.)  During that lunch, Ms. Thompson recalled that Mr. Moore made the

comment, "[I]f Dr. Johnson and State Board members were going to make the decision as

to these competitive grants, then we should not call them competitive grants, and just let

them decide who is going to get them."  (Thompson Dep. 68.)  In addition, Ms. Thompson

replied, "[T]hat would make [Dr. Bohannon's] job a whole lot easier if someone else decided

that."  (Thompson Dep. 68.)  Dr. Bohannon conceded in her deposition, however, that her

allegedly protected speech to Mr. Moore and Ms. Thompson played no role in the DOE's

decision not to retain her past her probationary period.  (Bohannon Dep. 221.)

###### 4.    *Fourth Instance of Alleged Protected Speech*

In February and March 2009, Dr. Bohannon also voiced her concerns about the

administration of the CCLC grant program to Dr. Bice, one of two DOE Deputy

Superintendents.  (Bohannon Dep. 38-39; Bice Dep. 9-10.)  In one of those meetings, Dr.

Bohannon laid out her concerns to Dr. Bice:

> I told him about the scoring, about the meeting and my speaking about that,
> and the response to my speaking out about it and shared with him what the
> indication was, that it was pressure from a superintendent, state
> superintendent, and a state board member, and there were never any reasons
> given other than that, and that it was evidence that Sallye [Longshore] and
> Deann [Stone] were upset.  And I told him I also talked to Edmund [Moore]
> and Edmund advised me it was best just not to say anything else.  And I told
> him Beth Thompson knew about it and Sherry Coleman knew about it.  I told
> him that the Better Basics was allowed to fax their budget to Dr. Johnson's
> office.  And Dr. Bice asked me who was involved, and I told him that.

(Bohannon Dep. 39.)  Dr. Bice responded to her concerns by saying that "he was going to go

back to Dr. Morton." (Bohannon Dep. 39.) Dr. Bohannon's complaint to Dr. Bice came at least a month after she was informed that she would not be granted merit status. (Bohannon Dep. 149.) Dr. Bohannon concedes that she did not discuss her concerns about Better Basics with Dr. Bice or Dr. Morton prior to January 5, 2009. (Bohannon Dep. 149.) Dr. Bice had no knowledge of the dispute concerning the Better Basics grant prior to the non-continuation of Dr. Bohannon's employment in January 2009. (Bice Dep. 78.) Finally, Dr. Bohannon conceded in her deposition that her allegedly protected speech to Dr. Bice played no role in the DOE's decision, made prior to this alleged speech, not to retain her past her probationary period. (Bohannon Dep. 149, 222.)

### 5. Fifth Instance of Alleged Protected Speech

Dr. Bohannon's final instance of alleged protected speech involved her misgivings about Dr. Stone's changing of the Marion County CCLC grant score sheet on October 3, 2008. (Bohannon Dep. 222.) Dr. Stone called Dr. Bohannon into her office, told her to bring back a blank score sheet, and told her to sit down. (Bohannon Dep. 43-44.) Dr. Bohannon then watched as "[Dr. Stone] changed the scores, the individual scores, to where they would tally a 90, and she tallied the score sheet to indicate a 90." (Bohannon Dep. 43-46.) In response to Dr. Stone's act of changing the Marion County score sheet, Dr. Bohannon "asked not to be involved in the Marion County" CCLC grant. (Bohannon Dep. 222.) Dr.

Bohannon also spoke to Beth Thompson and Sherry Coleman concerning the changed score sheet.[5]  (Bohannon Dep. 48.)

Dr. Bohannon called Beth Thompson, her friend and co-worker, on her cell phone while driving home from work on the evening of October 3, 2008.  (Bohannon Dep. 48-49; Thompson Dep. 107.)  Dr. Bohannon was in tears, and Ms. Thompson asked, "[T]hey changed a score sheet didn't they?"  (Bohannon Dep. 49.)  Dr. Bohannon told Ms. Thompson that she "was afraid to answer the question because I didn't want to get her involved," but then she "told her what happened."  (Bohannon Dep. 49.)  At her deposition, Dr. Bohannon explained her motivation for calling Ms. Thompson:  "I thought that Beth [Thompson] might have some insight as to why they did what they did.  And I did ask Beth [Thompson] her opinion on how to handle the situation, because I was more scared then than I was in

---

[5] During Dr. Bohannon's deposition on October 28, 2009, Defendants' counsel asked Dr. Bohannon, "[S]o you spoke to Beth Thompson and Sherry Coleman.  Is there anyone else you claim to have spoken to about the Marion County score sheet?"  (Bohannon Dep. 48.)  Dr. Bohannon replied, "No."  (Bohannon Dep. 48.)  Dr. Bohannon was again asked toward the close of her deposition if there were any other instances, besides the August 14, 2008 speech and the October 3, 2008 speech that led to her retaliation, to which she replied, "Not that I recall."  (Bohannon Dep. 222.)  In response to Defendants' motion for summary judgment filed on July 15, 2010, however, Dr. Bohannon's counsel included a new affidavit from Dr. Bohannon, dated July 14, 2010, claiming that she had also spoken to three other individuals about her concerns (Doc. # 31 Ex. 3, ¶ 9).  As to the contradiction between her deposition and her new affidavit, she explained, "[W]hen I was asked during my deposition who I spoke out to on these issues, I thought the attorney meant simply in and around the office."  (Doc. # 31 Ex. 3, ¶ 8.)

The court need not decide the sham affidavit issue raised by Defendants, however, because Dr. Bohannon's affidavit was filed out-of-time, nearly two months after the May 28, 2010 discovery deadline.  (Doc. # 14, ¶ 7.)  "Absent an affirmative showing by the non-moving party of excusable neglect according to Fed. R. Civ. P. 6(b), a court does not abuse its discretion in refusing to accept out-of-time affidavits."  *Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1568 (11th Cir. 1987) (internal citations omitted).  Dr. Bohannon did not file a Rule 6(b) motion to extend time to file the out-of-time affidavit, and there has been no showing of excusable neglect.  The July 14, 2010 affidavit will not be considered in ruling on Defendants' motion for summary judgment.

August." (Bohannon Dep. 51.)

Dr. Bohannon also spoke with her co-worker, Ms. Coleman, about the alteration of the Marion County score sheet. (Bohannon Dep. 50.) After Ms. Coleman asked about the October 3, 2008 meeting with Dr. Stone, Dr. Bohannon explained, "I just said that Dr. Stone was looking at readers' comments and responding to one of the superintendents. I didn't explain any detail to her." (Bohannon Dep. 50.) Dr. Bohannon was "very vague" with Ms. Coleman and did not explain the situation to her "because Sallye Longshore had informed [Dr. Bohannon] early in [her] employment that Sherry [Coleman] documents everybody and everything, to be very cautious of Sherry." (Bohannon Dep. 47-48.)

Finally, Dr. Bohannon mentioned to Dr. Bice that there "was another situation" beyond the issues surrounding the Better Basics grant, but that Dr. Bice respected "[her] request not to go into that because he felt like Better Basics was [the] one thing he wanted to deal with at [that] time." (Bohannon Dep. 50.) Therefore, Dr. Bohannon did not directly discuss the Marion County score sheet issue with Dr. Bice. (Bohannon Dep. 50.) Like the Better Basics grant issue mentioned above, the conversation with Dr. Bice tangentially touching on the Marion County score sheet did not take place until February 2009, after Dr. Bohannon had already been denied merit status. (Bohannon Dep. 38, 50.)

C.   **Scope of Dr. Bohannon's Employment Duties**

On November 13, 2008, Dr. Bohannon signed her pre-appraisal form, which listed the

following employment responsibilities that are pertinent to this case.[6]

1.   Composes letters, memos, proposals, applications, contracts, and formal reports so that accurate information is provided in accordance with federal and state policies in a timely manner with no valid complaint about accuracy.

2.   Provides guidance and technical assistance and monitoring with LEAs [local education agencies] to ensure LEAs are in compliance with federal and state guidelines in accordance with established criteria as evidenced by feedback, desk reviews, quarterly technical assistance meetings, and observation of supervisor.

3.   Provides technical assistance to LEAs which supports instructional improvements so that areas of need are identified and requests for assistance and information are met as evidenced by tracking systems, notes, feedback and observation of supervisor.

4.   Reviews material and documents so that designated documents are determined accurate and in compliance according to federal and state policies with no valid complaint and as evidence by reviews, feedback, and observation of supervisor.

5.   Plans, coordinates, and/or conducts workshops and meetings so that attendees receive current, comprehensive information regarding federal programs with no valid complaint about lack of information.

6.   Uses information acquired during workshops, inservice training, and meetings so that the services provided by the Federal Programs Section are accurate, current and comprehensive.

7.   Utilizes office software programs in order to increase efficiency in correspondence, communication, and meeting deadlines so that department and division/section goals are met as observed by the supervisor.

8.   Provides leadership in the coordination of the 21st Century Learning Community program and Dependent Care Development Grant programs and works to provide on-going assistance to the sub-grantees.

(Bohannon Dep. Ex. 16, at 1.)  Dr. Bohannon said that this list was not accurate, because

---

[6] The pre-appraisal form is the DOE's employment review tool used by supervisors for appraising employee performance.  (Bohannon Dep. Ex. 7, at 16-17.)  The DOE Policy Manual for Employees notes that "[i]f the employee disagrees with a matter reflected in the performance appraisal, the employee may attach comments regarding the portion of the appraisal with which the employee disagrees.  All comments must be provided to the rating supervisor and the SDE Personnel Manager within five business days from the date of the discussion of the performance appraisal and signature thereof."  (Bohannon Dep. Ex. 7, at 17.)   There is no evidence that Dr. Bohannon filed any comments to the pre-appraisal form.

"these are not all of the things that I did, nor did I do all of the things that are on here as a requirement of my job." (Bohannon Dep. 16.)  With the exception of conversations with Dr. Bice in February and March 2009, Dr. Bohannon's alleged instances of protected speech occurred before she was given her pre-appraisal form and list of roles and responsibilities on November 13, 2008.

Though the pre-appraisal form, with roles and responsibilities, was provided to Dr. Bohannon on November 13, 2008, Dr. Bohannon actually began her employment with the DOE on July 16, 2008.  (Bohannon Dep. Ex. 16; Bohannon Dep. Ex 17.)  From July 16, 2008, until November 13, 2008, Dr. Bohannon did not discuss her roles and responsibilities with her supervisors in her work with the DOE.  (Bohannon Dep. 19.)  Because Dr. Bohannon had not yet received formal acknowledgment of her roles and responsibilities, the court draws the facts surrounding Dr. Bohannon's official duties from her admissions relating to this period.

During her deposition, Dr. Bohannon acknowledged that she understood that her roles and responsibilities concerning the CCLC grants were "to work with [Dr.] Stone to review the applications . . . [for] new grantees as well as renewals," to "work[] on the Better Basics issue," to send out letters to the new grantees, and to transition the CCLC from the paper application to the electronic grants application process.   (Bohannon Dep. 21-24.)  Dr. Bohannon also acknowledged that her duties included providing technical assistance to grantees and assisting Dr. Stone in rank-ordering the grantees, but did not include scoring the

15

CCLC grant applications. (Bohannon Dep. 24-25.) By asking to be removed from managing the CCLC grants on August 14, 2008, Dr. Bohannon also admitted that her job duties included managing and overseeing those grants. (Bohannon Dep. 36.) Dr. Bohannon specifically asked her supervisors, Dr. Stone and Ms. Longshore, on August 14, 2008, "to be excused from participating in the activity of managing the [Better Basics] grant" and also "if [she] could be excused from overseeing the process for [the Better Basics] grant." (Bohannon Dep. 36.) Furthermore, in response to a question from Defendants' counsel about the decision to fund the Better Basics project in August 2008, Dr. Bohannon admitted that ensuring compliance with applicable rules and regulations for the CCLC grants was also a part of her job duties. (Bohannon Dep. 41.) Finally, she admitted that it was her responsibility as a professional to do what she could to ensure the integrity of the program. (Bohannon Dep. 62.)

**D.    Defendants' Decision to Terminate Dr. Bohannon**

In her "Statement of Disputed Facts," Dr. Bohannon draws two conclusions concerning her termination: (1) "Dr. Bohannon's Appraisal Process was a Concocted Paper Trail," and (2) "Conspiracy to Terminate Came from Defendants Morton, Stone and Longshore." (Doc. # 31, at 21-25.)[7]

---

[7] Facts, not Dr. Bohannon's conclusory arguments and subjective beliefs, have been drawn in the light most favorable to Dr. Bohannon. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*) (Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment). In her opposition brief, Dr. Bohannon says she disputes many of the facts concerning her termination, but does not cite contrary evidence for these disputes. (Doc. # 31, at 21-25.) (*See* Doc # 31, at ¶ 103: "Dr. Bohannon disputes that Dr. Bice gave a directive to Defendant Stone not to retain Dr. Bohannon," ¶ 104: "[Dr.]

The events and timeline leading up to the DOE's decision not to renew Dr. Bohannon's employment beyond the probationary period are material to Dr. Bohannon's allegations of retaliation. Dr. Bohannon's employment during the initial one-year period was probationary. (Bohannon Dep. 11; Bohannon Dep. Ex. 7, at 16.) On July 16, 2008, Dr. Bohannon began work with the DOE. (Bohannon Dep. 11.) Dr. Bohannon first noticed that there were concerns about her work performance when she received her pre-appraisal employment review by Ms. Longshore on November 13, 2008. (Longshore Dep. 26; Doc. # 31, ¶ 95.) The pre-appraisal employment review occurred in the fourth month of her employment with the DOE, not "immediately upon the beginning of the employee's appraisal cycle," as directed by the State of Alabama Performance Appraisal Manual. (Longshore Dep. 23, Pl. Ex. 17, at 21.) At the pre-appraisal employment review, Ms. Longshore advised Dr. Bohannon about her concerns with Dr. Bohannon's work and "[her] attitude and [her] professional behavior." (Bohannon Dep. 138.) Specifically, Dr. Bohannon said that Ms. Longshore advised her that these concerns had arisen because she "aired too much dirty laundry about the list [of CCLC grantees that was published in September 2008]" during her training session with the independent grant consultants on October 3, 2008. (Bohannon Dep. 138.) Dr. Bohannon did not recall any discussion of the Better Basics grant or the alteration

Bohannon disputes that Dr. Bice made the decision to terminate her," ¶ 113: "[Dr.]Bohannon disputes that Dr. Morton's approval [of her termination] was perfunctory," ¶ 114 "[Dr.] Bohannon disputes that Dr. Bice directed Defendant Stone not to retain Dr. Bohannon," ¶ 115 "[Dr.] Bohannon disputes that Dr. Bice did not know about the Better Basics issue before the decision to terminate Dr. Bohannon was decided," and ¶ 119 "[Dr.] Bohannon disputes that Dr. Bice made the decision not to retain her past probationary status.")

of the Marion County score sheet during the consultant training in which she aired "dirty laundry."  (Bohannon Dep. 181-82.)

In between Dr. Bohannon's pre-appraisal review and her January 5, 2009 mid-appraisal review, Dr. Bohannon's work performance came to the attention of Dr. Morton. (Morton Dep. 33-34.) The chain of events leading to Dr. Morton's attention on her work performance are as follows.  In late October, Dr. Bohannon conducted a training session on using the "e-Gap" computer system for recipients of the new CCLC grants in Columbiana, Alabama.  (Bohannon Dep. 152-54.)   During that session, Dr. Bohannon had technical difficulties accessing the e-Gap system online, and ultimately had to use the Elba City coordinator's log-in to access a different version of the e-Gap system.  (Bohannon Dep. 154.) Dr. Bohannon was never able to log on to the e-Gap system that she was assigned to teach the attendees.  (Bohannon Dep. 155.)  Dr. Bohannon described her presentation that day: "[T]here were some technical difficulties with my presentation because I had only been told I needed to use the test website address and was not told until I arrived in Tuscaloosa that I had to be on the VPN.  And I made multiple attempts to access e-Gap.  We found additional glitches."  (Bohannon Dep. 153-54.)    Additionally, Dr. Bohannon explained that "Sallye [Longshore] was not there.  She was only there on Monday.  She had already gone to Tuscaloosa, and . . . Sherry [Coleman] was not there.  There was no one there at the training site to assist with what was going on."  (Bohannon Dep. 154-55.)

18

In early November 2008, Dr. Bohannon received a letter from Dr. Morton stating "Great Work!" (Morton Dep. Ex. 4, at 1.)   Dr. Morton's note cited a November 4, 2008 letter from Hal R. Horton, the Principal of Highland Park Elementary School, who had attended the Columbiana training session and who "was very impressed with the leadership, especially that of Annette Bohannon who did a wonderful job keeping things going even through technical difficulties." (Morton Dep. Ex. 4, at 1-2.)

Mr. Horton's praise, however, was not the only feedback that Dr. Morton received about the Columbiana training session.  Sometime between the Columbiana training session and mid-November 2008, Dr. Morton's wife shared with her husband concerns that she had received about Dr. Bohannon's conduct at the Columbiana training session.  (Morton Dep. 35; Bice Dep. 18.) Dr. Morton's wife is a director of a non-profit organization in Sylacauga, Alabama, and some of her employees attended the Columbiana training session.  (Morton Dep. 35.)  These employees mentioned to Dr. Morton's wife that "it was not a good meeting, that it appeared that [Dr.] Bohannon was ill prepared and [that she] did not deliver good service." (Morton Dep. 36.)  In response to Dr. Morton's wife's complaint, in mid-November, Dr. Morton asked Dr. Bice to "look into it" and "asked [him] to inquire about [Dr.] Bohannon and her status with the department to check just to see, if [the meeting] did go poorly[;] we don't need to have an [extension] of employment offered to people [who] do a poor job." (Bice Dep. 18; Morton Dep. 34, 39.)  Ultimately, Dr. Morton does not remember the sequence in which he received the positive feedback from Mr. Horton and the

19

negative feedback from his wife about Dr. Bohannon's conduct at the Columbiana training session. (Morton Dep. 42.)

Dr. Bice remembered meeting with Dr. Morton about the complaint concerning Dr. Bohannon. (Bice Dep. 18.) Dr. Morton told Dr. Bice that "there had been lack of clarity, lack of successfully communicating the message in a meeting out in the state for which [Dr.] Bohannon was responsible." (Bice Dep. 18.) Dr. Morton did not tell Dr. Bice that the complaint had come from his wife, or his wife's employees. (Bice Dep. 19, 118.) Dr. Bice acknowledged that Dr. Morton was the sole source of his directive to investigate Dr. Bohannon, and that he did not discuss the Columbiana training session with Dr. Stone and Ms. Longshore, or any other attendees at the training session. (Bice Dep. 21.) His only other feedback on the Columbiana training session came from "information from the field indicating that . . . the feedback was less than positive." (Bice Dep. 22.)

Dr. Bice concluded that Dr. Bohannon "was not a good fit for the Department," because of her "inability to communicate the message at the Columbiana meeting effectively." (Bice Dep. 51.) Dr. Bice also considered "prior knowledge of [Dr. Bohannon's] work behavior" that he had gathered from others in the profession during her earlier application for employment with the Alexander City school system while he was its superintendent. (Bice Dep. 52.) Dr. Bice described this "knowledge" as "[j]ust generalities of not being necessarily a committed employee." (Bice Dep. 52-53.) In reference to his discussion with Dr. Morton about Dr. Bohannon, Dr. Bice said that "it was [his] decision,

20

not [Dr. Morton's] decision," to terminate Dr. Bohannon.  (Bice Dep. 125.)

Dr. Bice told Dr. Stone and Ms. Longshore not to grant merit status to Dr. Bohannon. (Bice Dep. 119; Stone Dep. 112-13; Longshore Dep. 111.)  Dr. Bice said he made the decision himself and did not terminate her on the advice or recommendation of anybody else. (Bice Dep. 110, 116.)  In deciding to terminate Dr. Bohannon rather than to implement a form of progressive discipline, Dr. Bice said, "In my tenure, I've made [the decision to terminate,] a choice that I made, not only her case, but others, that as a spokesman for the Department, I can't afford a second mistake."  (Bice Dep. 117.)  To carry out his directive to terminate Dr. Bohannon, Dr. Bice went to Dr. Stone's office on December 16, 2008, and told her "that he had received negative comments about Dr. Bohannon, and to not . . . extend her merit status."  (Stone Dep. 114.)  Dr. Stone asked Dr. Bice from whom he had received negative comments, to which Dr. Bice responded, "That's not important." (Stone Dep. 114.)

After Dr. Bice's directive, Ms. Longshore and Dr. Stone reduced to writing their concerns about Dr. Bohannon's work performance in Dr. Bohannon's employee performance mid-appraisal on January 5, 2009.  (Longshore Dep. 98, Bohannon Dep. Ex. 16, at 2.)  It was at this employee performance mid-appraisal on January 5, 2009, that Ms. Longshore "read to [Dr. Bohannon] the items on the list, [and] told [Dr. Bohannon] that [she] was not a good fit."  (Bohannon Dep. 140.)  Those items indicated that Dr. Bohannon needed to "improve documentation and ongoing supervision of contractual employees; improve on providing timely communication with supervisor regarding specific tasks; be[] more attentive to

21

providing support to systems assigned in her region; and ensur[e] timely review and approval of [] CCLC grants."  (Longshore Dep. 98-102; Bohannon Dep. Ex. 16, at 2).  Dr. Stone then informed Dr. Bohannon "that she had until June 30th to find another job."  (Bohannon Dep. 141.)

On January 9, 2009, Dr. Stone submitted a memorandum to Gail Blankenship, DOE personnel director, and Dr. Morton and Dr. Bice, among others, stating, "Please be advised that Dr. Annette P. Bohannon will be separated from the [DOE] at the end of her Probationary period effective June 30, 2009."  The memorandum stated:

> The reasons for separation include, but are not limited to:
> • improper documentation and on-going supervision of contractual employees;
> • untimely communication with supervisor regarding specific tasks;
> • lack of support and timely provision of technical support to systems in assigned regions;
> • inattention to timely approval of [CCLC] grants; and
> • not being sufficiently prepared for training sessions and meetings with grantees and district personnel.

(Morton Dep. Ex. 6, at 4.)

On January 16, 2009, Dr. Bohannon signed her final appraisal form in Ms. Longshore's presence. (Bohannon Dep. 141; Bohannon Dep. Ex. 17, at 5.)  The final appraisal form described her performance as "Partially Meets Standard," and Ms. Longshore awarded her a responsibility score of 16.25 out of a total possible 40 points on her duties and responsibilities with the DOE.  (Bohannon Dep. Ex. 17, at 5-6.)  The form was signed by Dr. Stone on January 20, 2009, and by Dr. Morton on January 22, 2009.

On January 21, 2009, the DOE mailed a letter to Dr. Bohannon, signed by Dr. Morton, stating that she would be terminated at the end of the probationary period on June 30, 2009, because her work was "not meeting the standards of the job."[8] (Bohannon Dep. Ex. 17, at 3.) In the letter, Dr. Morton explained that he had received "a recommendation from Dr. Deann Stone, Director of Federal Programs, that [her] employment as an Educational Specialist with the State [DOE] be terminated . . . ."[9] (Bohannon Dep. Ex.17, at 3.) The letter came from Dr. Morton's office, because as the DOE Superintendent, "he is the only person who can terminate an employee." (Bice Dep. 119.) Neither Dr. Stone's January 9, 2009 memorandum to Dr. Morton, nor Dr. Morton's January 21, 2009 termination letter mentioned Dr. Bice's directive to Dr. Stone to terminate Dr. Bohannon. (Morton Dep. Ex. 6, at 3-4.) Dr. Bohannon relies on Dr. Morton's January, 21, 2009 letter, that letter's reference to Dr. Stone's recommendation, and the lack of mention of Dr. Bice in the aforementioned documents as evidence that the decision to terminate her was made by Defendants collectively and not by Dr. Bice individually. (Doc. # 31, ¶¶ 95-131.) The court assumes, without deciding, that the decision to terminate Dr. Bohannon was in fact collectively made by Ms. Longshore, Dr. Stone, and Dr. Morton, and not solely by Dr. Bice. For purposes of this opinion, that fact is construed in Dr. Bohannon's favor.[10]

---

[8] Dr. Morton contends that he did not sign the letter. (Morton Dep. 92.)

[9] Ultimately, Dr. Bohannon did not receive this letter because the mailing address was wrong. (Bohannon Dep. 145.)

[10] Both parties focus extensively on the issue of who terminated Dr. Bohannon. Ultimately, determination of this issue is not necessary to resolution of the case.

On January 30, 2009, Dr. Bohannon submitted a rebuttal to Dr. Morton and Dr. Bice explaining her concerns with her January 5, 2009 mid-appraisal and her January 16, 2009 final appraisal, as well as the circumstances surrounding her performance. (Bohannon Dep. Ex. 18.) Dr. Bohannon submitted this rebuttal on the advice of Dr. Bice. (Bohannon Dep. 147-48.) Dr. Bohannon's rebuttal made no mention of her instances of alleged protected speech. (Bohannon Dep. Ex. 18.) Dr. Bice received the rebuttal, and met with Dr. Bohannon multiple times in February and March 2009, to discuss her options and a possible transfer within Dr. Bice's department. (Bohannon Dep. 148; Bice Dep. 107-08.) Despite these meetings, Dr. Bohannon was not offered a transfer, and her employment with the DOE ended on June 30, 2009. (Bohannon Dep. Ex. 17, at 1.)

## IV. DISCUSSION

Defendants contend that summary judgment is proper because Dr. Bohannon, a public employee, cannot establish a prima facie First Amendment retaliation claim.[11] Specifically, Defendants contend that as a matter of law, Dr. Bohannon did not speak as a citizen on a matter of public concern, and that there is no genuine issue of material fact that Dr. Bohannon's speech did not play a substantial or motivating role in Defendants' decision to

---

[11] Dr. Bohannon has waived her Fourteenth Amendment due process claim (Compl. 4-5), by failing to preserve the claim in the pretrial order. (Doc. # 51.) Fed. R. Civ. P. 16(e). *See Morro v. City of Birmingham*, 117 F.3d 508, 515 (11th Cir. 1997) ("We have not hesitated to back up district courts when they put steel behind the terms of pretrial orders and hold parties to them. We held in *Hodges v. United States*, 597 F.3d 1014, 1017 (5th Cir. 1979), that a defendant can waive a potential defense by failing to ensure that the issue is clearly preserved in the pretrial order."). Dr. Bohannon did not request the Fourteenth Amendment claim be included in the pretrial order. (Doc. # 51, at 2-5.) In fact, other than a brief mention of the Fourteenth Amendment claim in the complaint, it has not been cited, discussed, or argued at any other time in these proceedings.

terminate her employment. For the following reasons, Defendants' arguments are persuasive.

A public employee's claim that she was discharged in alleged retaliation for exercise of her First Amendment rights is analyzed under a four element inquiry adopted from *Pickering v. Board of Education. D'Angelo v. Sch. Bd. of Polk Cnty., Fla.*, 497 F.3d 1203, 1208 (11th Cir. 2007) (citing *Pickering*, 391 U.S. 563, 568 (1968)). The public employee bears the burden on elements (1) - (3) of the inquiry. *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005). To prevail, the employee must show that (1) she "spoke as a citizen on a matter of public concern," *D'Angelo*, 497 F.3d at 1209 (citing *Garcetti v. Ceballos*; 547 U.S. 410, 418 (2006)); "(2) the employee's free speech interest outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action." *Cook*, 414 F.3d at 1318. If a public employee satisfies elements (1) - (3), under element (4), the burden shifts to the employer "to show by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech." *Id.* Elements (1) - (2) are questions of law concerning whether the First Amendment protects the employee's speech. *Id.* Elements (3) - (4) are "questions of fact designed to determine whether the alleged adverse employment action was in retaliation for the protected speech." *Id.* (internal quotations omitted).

Defendants contend that under element (1), Dr. Bohannon did not speak as a citizen on a matter of public concern. (Doc. # 24, at 23.) Additionally, Defendants contend that

under element (3), because Dr. Bice made the decision not to retain Dr. Bohannon, and was not aware of Dr. Bohannon's speech, that speech could not have played a substantial or motivating role in the decision to terminate her employment.[12]   (Doc. # 24, at 20.)   Dr. Bohannon contends that she produced sufficient evidence to establish a prima facie case and raise a genuine issue of material fact on the elements in question, and therefore summary judgment should be denied.  (Doc. # 31, at 26.)

A.   **Dr. Bohannon's Second, Third, Fourth, and Part of Her Fifth Instance of Alleged Protected Speech Did Not Play a Substantial or Motivating Role in the Decision to Terminate Her Employment**

Under element (3) of the *Pickering* framework, the causation element, Dr. Bohannon bears the burden of showing that "the speech played a substantial or motivating role in the adverse employment action."  *Akins v. Fulton Cnty.*, 420 F.3d 1293, 1303 (11th Cir. 2005). Defendants have shown that there is no genuine issue of material fact that these alleged instances of speech did not play a substantial or motivating role in the decision to terminate her employment, and Dr. Bohannon has failed to produce evidence to rebut that showing. Because there is no issue of material fact on causation regarding these claims, it is not necessary to decide whether these instances of speech made to co-workers are constitutionally protected under elements (1) and (2) of the *Pickering* and *Garcetti* analysis. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445-46 (1988) ("A

_____

[12] In their brief, Defendants do not address element (2) of the *Pickering* inquiry, and, thus, the court will not address this element.

fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them. . . . If no additional relief would have been warranted, a constitutional decision would have been unnecessary and therefore inappropriate.").

At her deposition, Dr. Bohannon was asked by opposing counsel about which instances of her speech led to her not being retained. (Bohannon Dep. 220-22.)  In response, Dr. Bohannon specifically cited her first instance of alleged protected speech with Ms. Longshore and Dr. Stone regarding the Better Basics grant on August 14, 2008, and the portion of her fifth instance of alleged protected speech made to Dr. Stone regarding the Marion County score sheet on October 3, 2008. (Bohannon Dep. 222.)  She responded that she did not recall any other instances of her speaking out that led to her retaliation. (Bohannon Dep. 222.)

### 1.    *Dr. Bohannon Conceded that Her Third and Fourth Instances of Alleged Protected Speech Were Not a Cause of Her Termination*

Dr. Bohannon conceded that her third instance of alleged protected speech to Mr. Moore and Ms. Thompson was not a cause of her termination. (Bohannon Dep. 221.)  She also conceded that her fourth instance of alleged protected speech was made to Dr. Bice in February and March 2009, after the decision to terminate her had already been made and communicated to her. (Bohannon Dep. 149, 222; Bice Dep. 78.)  *See Mize v. Jefferson City Bd. of Ed.*, 93 F.3d 739, 741 & 745 (11th Cir. 1996) (affirming summary judgment as

appropriate in a First Amendment retaliation case where defendants' testimony showed that the decision to terminate the plaintiff was made earlier that day, before the allegedly protected speech, and therefore defendants had no reason to retaliate against plaintiff at the time the termination decision was made).

### 2. Dr. Bohannon Failed to Present Evidence that Her Second and Fifth Instances of Alleged Protected Speech Directed to Her Co-Workers Were a Cause of Her Termination

Dr. Bohannon has failed to produce any evidence regarding a nexus between the second instance of alleged protected speech and the decision to terminate her employment. Dr. Bohannon has not produced any evidence that Defendants knew about her speech to Mr. Moore on August 14, 2008.  In fact, Dr. Bohannon does not once mention her second instance of alleged protected speech in the section of her response brief entitled, "The Voicing of Plaintiff's Personal Indignation Played a Substantial and Motivating Role in Her Termination."  (Doc. # 31, at 41-46.)

Dr. Bohannon also has failed to produce any evidence showing a nexus between the portion of her fifth instance of alleged protected speech directed to her co-workers Beth Thompson and Sherry Coleman and the decision to terminate her employment.  She has not produced evidence Defendants knew about her October 3, 2008 speech to Ms. Thompson or Ms. Coleman  prior to the decision to terminate her.  Again, Dr. Bohannon does not mention this speech in the section of her response brief entitled, "The Voicing of Plaintiff's Personal

Indignation Played a Substantial and Motivating Role in Her Termination."  (Doc. # 31, at

41-46.)  In that section, Dr. Bohannon's theory of the case on the element of causation is that

"[i]t is reasonable to infer that because Dr. Bohannon expressed her dissent on an issue

involving high-level political influence *to Defendants Stone and Longshore*, the Defendants

in turn, reported her discontent to their superiors."  (Doc. # 31, at 42 (emphasis added).)

Nowhere does Dr. Bohannon produce evidence, direct or circumstantial, that her speech to

Ms. Thompson or Ms. Coleman concerning the Marion County score sheet played any role

in the decision to terminate her.[13]  Therefore, Defendants are entitled to summary judgment

on this portion of the fifth instance of alleged protected speech and the second instance of

alleged protected speech.

**B.**    **With Respect to Her Remaining Instances of Alleged Protected Speech, Dr.**
      **Bohannon Did Not Speak as a Citizen**

To proceed with a First Amendment retaliation claim, Dr. Bohannon must, as a matter

of law, show that she "spoke as a citizen on a matter of public concern."  *Abdur-Rahman v.*

---

[13] Dr. Bohannon claims in her "Statement of Disputed Facts" that Dr. Stone admitted that "Dr. Bohannon was speaking out 'to everyone but me.'" (Doc. # 31, at 9 (citing Stone Dep. 75).)  This is the only evidence the court can discern of a nexus between Dr. Bohannon's speech to parties other than Defendants and the decision to terminate her.  Examining Dr. Stone's deposition in context shows that Dr. Stone did not admit knowledge of Dr. Bohannon's speech to other individuals.  Dr. Stone's deposition transcript reads "Q: And you [Dr. Stone] knew she [Dr. Bohannon] was raising questions about the whole Better Basics system, didn't you?  A: I did not.  Q: How could you not know? I mean, she was talking about it all over the place.  A: To everyone but not me."  Quoting "to everyone but not me" out of context, Dr. Bohannon fails to explain how a witness can testify that she had no knowledge of Dr. Bohannon's speech, then respond to the next question claiming that she knew that Dr. Bohannon was in fact speaking "to everyone but not me."  Even viewing such evidence in the light most favorable to Dr. Bohannon, the quotation does not advance her claim.

*Walker*, 567 F.3d 1278, 1281-82 (11th Cir. 2009) (internal citations omitted). The Supreme Court has acknowledged that this initial inquiry is necessary because "[t]he First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Garcetti*, 547 U.S. at 419 (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). To that end, "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.*

As the Eleventh Circuit explained in *Abdur-Rahman*, "*Garcetti* controls our analysis of whether the [plaintiff] spoke as [a] citizen[]." 567 F.3d at 1282. As a result, a discussion of *Garcetti* is necessary to the determination that Dr. Bohannon did not speak as a citizen.

In *Garcetti*, the Supreme Court held that a deputy district attorney, Ceballos, did not speak as a citizen "by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, [he] acted as a government employee. The fact that his duties sometime required him to speak or write does not mean his supervisors were prohibited from evaluating his performance." *Garcetti*, 547 U.S. at 422.

The Supreme Court held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer

discipline." *Garcetti*, 547 U.S. at 421.   The controlling inquiry is whether the speech was made pursuant to the public employee's official duties. *Id.* The location and subject matter of the speech are not individually dispositive. *Id.* at 420-21.  In *Garcetti*, Ceballos spoke as an employee because "the memo was written pursuant to Ceballos' official duties." *Id.* at 421.

Articulating the policy behind its new bright-line rule, the Supreme Court in *Garcetti* stated that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen[; i]t simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421-22.

To determine the scope of an employee's official duties, the Supreme Court instructed that "[t]he proper inquiry is a practical one." *Id.* at 424.  A practical inquiry is necessary because,

> [f]ormal job descriptions often bear little resemblance to the duties an employee is actually expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id.* at 424-25.  Rather, the court must "'look to the content, form, and context of a given statement, as revealed by the whole record.'" *Abdur-Rahman*, 567 F.3d at 1283 (quoting *Vila v. Pardon*, 484 F.3d 1334, 1340 (11th Cir. 2007)).

### 1.   *Dr. Bohannon's First Instance of Speech Was Made as an Employee*

31

Dr. Bohannon's speech to her supervisors, Ms. Longshore and Dr. Stone on August 14, 2008, concerning the funding of the Better Basics grant, was made as an employee of the DOE, not as a citizen.  Expressing her concerns with the funding of the Better Basics grant, despite a score below the cut-off, Dr. Bohannon said "[t]hat it wasn't right. . . . [S]ome other grantee that qualified would be bumped and lose their grant.  It was unethical and unfair."  (Bohannon Dep. 36.)   Dr. Bohannon then asked multiple times "if [she] could be excused from overseeing the process for that particular grant."  (Bohannon Dep. 36.)

The content and form of Dr. Bohannon's speech show that she spoke as the DOE manager of the CCLC grants.  By requesting to be excused from managing the CCLC grants, Dr. Bohannon spoke in a way that no ordinary citizen could possibly speak; she asked to be excused from her duty as *the* employee managing that particular grant.  (*See also* Compl. 2 (admitting that "[a] large part of [Dr. Bohannon's] work involved her management and administration of these competitive grants")).  "Speech that owes its existence to the official duties of public employees is not citizen speech even if those duties can be described so narrowly as not to mandate the act of speaking."  *Abdur-Rahman*, 567 F.3d at 1285.  "In that context, '[t]here is no relevant analogue to speech by citizens who are not government employees,' and the speech is unprotected."  *Id.* at 1285-86 (quoting *Garcetti*, 547 U.S. at 424).

In addition, the context of the meeting confirms that she spoke as an employee.  Dr. Bohannon's speech was made in response to an e-mail solely from Ms. Longshore to Dr.

Bohannon that read, "*[W]e* need to make a determination about [Better Basic's] grant - Board and Supt pressure!  I will meet you in Commons area."  (Stone Dep. Ex. 10, at 2 (emphasis added).)  The meeting was then held in the commons area of their workplace, and was attended by Dr. Bohannon and her two supervisors, Ms. Longshore and Dr. Stone. (Bohannon Dep. 35-36.)  Dr. Bohannon's speech was made directly to her two supervisors concerning funding of a CCLC grant that she felt was "unethical" and "unfair," "because *we* had already looked at [Better Basics's] score and it did not qualify. . . . [S]ome other grantee that qualified would be bumped and lose its grant."  (Bohannon Dep. 35-36 (emphasis added).)

Dr. Bohannon argues that *Abdur-Rahman* does not apply because "[s]urely, had non-government employees learned of the political arm-twisting that funneled money to improper awardees such as Better Basics, they, too, would have spoken out on the subject, just as Plaintiff did." (Doc # 31, at 31.)  Dr. Bohannon's hypothetical ignores the content, form, and context of her speech, as well as the whole record.  *Abdur-Rahman,* 567 F.3d at 1286.  Dr. Bohannon's speech owed its existence to her employment duties.  Her speech included a request to be excused from her own employment duties, employment duties she admitted included ensuring that the CCLC grants were in compliance with applicable rules and regulations and ensuring the integrity of the program.  (Bohannon Dep. 41, 62.)  It was also made directly to her supervisors, in response to a meeting about the very grants she managed. Simply put, Dr. Bohannon's speech could never have been made by an ordinary citizen;

therefore, her speech as an employee does not warrant First Amendment protection.

In addition, Dr. Bohannon argues that "she was not the proper employee to address fraud," and "once she reported the grant application inconsistences, Dr. Bohannon's job-related speech ended, because it was not her duty to determine which grant applications were deemed valid recipients." (Doc. # 31, at 33.) Therefore Dr. Bohannon "had reached the limit of her possible involvement in an official capacity," and she could not have spoken as an employee.  (Doc. # 31, at 33.)  Dr. Bohannon's argument is based on *Battle v. Board of Regents for the State of Ga.*, 468 F.3d 755, 761 (11th Cir. 2006).  Unlike the plaintiff in that case who "admitted her comments fell within her required duties," Dr. Bohannon contends that she "has made no such admissions."  (Doc. # 31, at 32-33.)  For the following reasons, Dr. Bohannon's arguments fail.

In *Battle*, a university work study supervisor spoke out to her supervisor, the director of the Federal Work Study Program, about fraud in student files that the plaintiff discovered her supervisor had committed.  468 F.3d at 757-58.  The plaintiff also took these complaints to the University's director of financial aid and the vice president of student affairs.  *Id.* After voicing those complaints, the plaintiff was told that her employment contract would not be renewed.  *Id.* at 758-59.  After notice of her non-renewal, the plaintiff met with the Georgia DOE and "provided sixty-one pages of documents showing potential fraud and a thirty-two page analysis of student files."  *Id.* at 759.  Following audits and plaintiff's report, investigators discovered "serious noncompliance with federal regulations and risk factors for

fraud," resulting in a "$2,167,941 settlement with the DOE to settle questioned costs." *Id.*
Despite discovery of actual improprieties and the resignation of the plaintiff's supervisor, the
Eleventh Circuit affirmed summary judgment for the work-study supervisor, the university's
director of financial aid, and the university's vice president of student affairs on the
plaintiff's First Amendment retaliation claims *Id.* at 759 & 761-62.

In *Battle*, the court held that "Plaintiff's speech to [university] officials about
inaccuracies and signs of fraud in student files was made pursuant to her official employment
duties [as a work study supervisor in the Federal Work Study Program]." *Id.* at 761-62.  The
plaintiff in that case admitted that "she had a clear employment duty to ensure the accuracy
and completeness of student files as well as to report any mismanagement or fraud she
encountered in the student financial aid files." *Id.* at 761.  After the Supreme Court decided
*Garcetti*, the plaintiff in *Battle* "attempt[ed] to limit the scope of her admission by claiming
her only employment duties related to her control and oversight of financial aid information
provided by certain students, and not to the discovery of fraud by her supervisor." *Id.* at 761
n.6.  The court in *Battle* rejected such an attempt to limit the scope of her admission because
she had an official duty to report such fraud under DOE guidelines. *Id.*  Because Dr.
Bohannon claims she did not make an admission like that of the plaintiff in *Battle*, the court
will also examine the result of *Abdur-Rahman*.

In *Abdur-Rahman*, the court addressed a First Amendment retaliation claim where the
plaintiffs did not admit that they spoke pursuant to their official duties.  567 F.3d at 1283.

35

In that case, the plaintiffs were sewer compliance inspectors who expressed concerns to their supervisors about sanitary sewer overflows. *Id.* at 1279. During at least a portion of their employment, the plaintiffs' specific job duties did not include the task of investigating sanitary sewer overflows.[14] *Id.* at 1280. Rather, the sewer compliance inspectors "were instructed . . . to write ordinances for the county about the disposal of fat, oil, and grease. Although this responsibility did not require the inspectors to review data about sanitary sewer overflows, the inspectors wanted to inspect that data as part of their work." *Id.* Their supervisors resisted their requests for such data, and told the inspectors that "they were ruffling too many feathers." *Id.* Ultimately, the court held that the plaintiffs did not speak as private citizens because "[t]he inspectors' reports about sewer overflows concerned information they requested and investigations performed for the purpose of fulfilling their assigned job duties. The inspectors' reports 'owe their existence,' to their official responsibilities and cannot reasonably be divorced from those responsibilities." *Id.* at 1283 (quoting *Garcetti*, 547 U.S. at 421). The fact that the plaintiffs in that case were not required by their official duties to make the speech that allegedly led to their terminations was not sufficient to transform their speech into that of a citizen. *Id.* at 1286 (noting that granting

---

[14] In *Abdur-Rahman*, the plaintiffs' official job duties did not specifically include the requirement that they inspect sanitary sewer overflows from the start of their employment in August and September 2004 until early 2005. 567 F.3d at 1280. Such a job duty was only added around the same time, January 2005, that their supervisor recommended that they be terminated for unsatisfactory work performance. *Id.* In that regard, the case is similar to Dr. Bohannon's; however, Dr. Bohannon has admitted that she spoke pursuant to her job duties despite later efforts to parse such comments. *See Battle*, 468 F.3d at 761.

constitutional protection for such speech would allow "public employees . . . to request nonpublic information under the auspices of their job duties and then gain constitutional protection for whatever statements they desire to make about that information, so long as the employees are able to describe their assigned responsibilities narrowly enough to exclude the act of making those statements").

In her opposition to summary judgment, Dr. Bohannon, like the plaintiffs in *Battle* and *Abdur-Rahman*, has attempted to limit the scope of her assigned duties in order to push her August 14, 2008 speech into the realm of citizen speech. Regarding such post-hoc attempts to abdicate employment duties, the court in *Abdur-Rahman* noted, "We have consistently discredited narrow, rigid descriptions of official duties urged upon us to support an inference that public employees spoke as private citizens." 567 F.3d at 1285 (citing *D'Angelo*, 497 F.3d at 1210-11; *Vila*, 484 F.3d at 1340; *Battle,* 468 F.3d at 761 & n.6).

The after-the-fact attempt to abdicate official responsibility fails in this case for the same reasons it failed in *Battle*. Dr. Bohannon spoke up because she was required to do so under her employment duties. Dr. Bohannon admitted that her duties included managing the CCLC grants, ensuring compliance with applicable rules and regulations, and ensuring the integrity of the CCLC program. (Compl. at 2; Bohannon Dep. 41, 62.) The content of her speech that day only confirms her motivation for speaking. Dr. Bohannon spoke to her supervisor because she felt that Better Basics was "a grantee that didn't qualify based on the scoring criteria." (Bohannon Dep. 94.) As a result, Dr. Bohannon expressed her concern that

funding such a project "wasn't right. . . . [I]t was unethical and unfair." (Bohannon Dep. 36.)

Further, she explained her dismay that the meeting with Ms. Longshore and Dr. Stone was

even being held that morning: "I didn't know why we were at the table, because *we* had

already looked at their score and they did not qualify." (Bohannon Dep. 35 (emphasis

added).) These admissions belie Dr. Bohannon's attempts to paint her speech as motivated

by her subjective interest as a "taxpayer" and her "personal concerns." (Bohannon Dep. 93-

94.) To rule otherwise would be to ignore the reality that her speech to her supervisors that

day owed its existence to her official duties, and such speech cannot reasonably be divorced

from those duties. *See Abdur-Rahman*, 567 F.3d at 1283 & 1286. Therefore, Dr.

Bohannon's First Amendment claim regarding the August 14, 2008 speech is due to fail.

> ### 2. *Dr. Bohannon's Fifth Instance of Speech Directed to Dr. Stone Was Made as an Employee*

Dr. Bohannon's speech on October 3, 2008, to her supervisor, Dr. Stone, asking "not

to be involved" in the Marion County grant was also made as an employee of the DOE, not

as a citizen.[15] (Bohannon Dep. 222.) Like her August 14, 2008 speech to her supervisors,

the content, form, and context of Dr. Bohannon's October 3, 2008 speech to her supervisor

concerning a change in a CCLC grant score sheet was made pursuant to her official duties,

and is not protected by the First Amendment.

---

[15]As previously discussed, Dr. Bohannon's further instances of speech that day to Ms. Thompson and Ms. Coleman concerning the Marion County score sheet fail because Dr. Bohannon has produced no evidence that they were a substantial or motivating cause of her termination.

Dr. Bohannon's speech to Dr. Stone is directly analogous to the unprotected speech of the plaintiff in *Battle*. *See supra* Part IV.B.1. Like the plaintiff in *Battle*, Dr. Bohannon's claim regarding her October 3, 2008 speech to Dr. Stone must fail because she spoke pursuant to her employment duties. The content and form of Dr. Bohannon's speech show that she spoke as the manager of the CCLC grants. Dr. Bohannon asked her supervisor "not to be involved in the Marion County" grant. (Bohannon Dep. 222.) In her complaint, Dr. Bohannon admits that "[a] large part of [her] work involved her management and administration of these competitive grants." (Compl. 2.) By requesting to be excused from managing this CCLC grant, Dr. Bohannon spoke in a way that no ordinary citizen could possibly speak; she asked to be excused from her duty as *the* employee managing that particular grant. (Bohannon Dep. 41, 62.) Furthermore, the context involved speech in a private office between the employee responsible for managing these grants and the Director of Federal Programs, who had just altered the score sheet by which CCLC grants were funded. The content, form, and context of Dr. Bohannon's speech raising concerns about her supervisor's improprieties show that it fell within and owed its existence to her official job duties. The court cannot divorce Dr. Bohannon's speech from her admitted employment duties, and therefore her final claim is due to fail. *See Abdur-Rahman*, 567 F.3d at 1283 & 1286.

## V.  CONCLUSION

Defendants' Motion for Summary Judgment is due to be granted on Dr. Bohannon's First Amendment claim regarding all alleged instances of protected speech.  In granting summary judgment on these claims, the court notes that "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance." *Garcetti*, 547 U.S. at 425.  However, this matter of considerable significance is not protected by the First Amendment, but rather "by the powerful network of legislative enactments – such as whistle-blower protection laws and labor codes – available to those who seek to expose wrongdoing." *Id.*  It is "[t]hese imperatives, as well as obligations arising from any other applicable constitutional provisions and mandates of criminal and civil laws, [that] protect employees and provide checks on supervisors who order unlawful or otherwise inappropriate actions." *Id.* at 425-26.

For the foregoing reasons, it is ORDERED that Defendants' Motion for Summary Judgment (Doc. # 23) is GRANTED.  A separate judgment will be issued.

DONE this 27th day of December, 2010.

    /s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE